**SALYER LAND COMPANY, a California corporation, et al., Plaintiffs,**

v.

**TULARE LAKE BASIN WATER STORAGE DISTRICT, a public district, Defendant.**

Civ. No. F–414.

United States District Court, E. D. California.

Feb. 17, 1972.

Probable Jurisdiction Noted June 26, 1972.

See 92 S.Ct. 2496.

C. Ray Robinson, Merced, Cal., Thomas Keister Greer, Rocky Mount, Va., for plaintiffs.

Robert M. Newell, Newell & Chester, Ernest M. Clark, Jr., Donnelly, Clark, Chase & Haakh, Los Angeles, Cal., for defendant.

Before BROWNING, Circuit Judge, and CROCKER and SCHNACKE, District Judges.

## MEMORANDUM AND ORDER

### PER CURIAM.

This court has jurisdiction under section 1343 of Title 28 and section 1983 of Title 42 of the United States Code, and a three-judge court has been convened pursuant to section 2284 of Title 28 of the United States Code.

The case was submitted on factual statements of the parties and briefs, without testimony or oral argument. Plaintiffs were represented by C. Ray Robinson, Esq., and Thomas Keister Greer, Esq.; defendant was represented by Robert M. Newell, Esq., and Ernest M. Clark, Jr., Esq.

Plaintiffs are landowners or resident registered voters within the area covered by defendant, Tulare Lake Basin Water Storage District, which was organized pursuant to California law.

In this action, plaintiffs contend that California Water Code §§ 41000 and 41001 [1] are unconstitutional in that they deny plaintiffs the equal protection of the law guaranteed by the fourteenth amendment of the Constitution of the United States in that they permit only landowners to vote and give them one vote for each $100 of assessed valuation. Thus non-landowners cannot vote, and the small landowners get fewer votes than the large landowners.

Plaintiffs seek an order of this court enjoining defendant from giving effect to

---

1. § 41000. *Qualification.* Only the holders of title to land are entitled to vote at a general election.

 § 41001. *Vote in precinct; number of votes.* Each voter may vote in each precinct in which any of the land owned by him is situated and may cast one vote for each one hundred dollars ($100), or fraction thereof, worth of his land, exclusive of improvements, minerals, and mineral rights therein, in the precinct.

these sections and requiring defendant to submit a plan whereby all residents be permitted only one vote regardless of land-ownership.

■ At the outset, defendant asks this court to abstain from rendering a decision, but abstention is not proper in this case as the California Supreme Court has already upheld the constitutionality of these two sections.

Defendant is a water storage district organized in 1926 under California law which limits its activities to the development and improvement of the water supply within the district, thus benefitting the land which alone bears the cost.

It performs no governmental functions of general concern to the populace and provides no service to the general public such as found by the court in Burrey v. Embarcadero Municipal Improvement District recently decided by the Supreme Court of California.

The State of California has a compelling interest in the development of its water resources, and limiting the vote to landowners is necessary to further this state interest because it is doubtful if the District would have been formed unless the persons paying the expenses could control them.

■ While it is true that the activities of the District affect the economy of the area which is of interest to residents that are not landowners, this is an indirect interest and not a direct, primary and substantial interest that would entitle them to vote. Thus limiting the vote to landowners in this particular water district does not violate plaintiffs' constitutional rights, and the "one man, one vote" cases cited by plaintiffs are not controlling in this special purpose district.

■ Section 41001 providing one vote for each $100 of assessed valuation is not unconstitutional as the benefits and burdens to each landowner in the District are in proportion to the assessed value of the land, so permitting voting in the same proportion fairly distributes the voting influence.

The remaining issue in this case is the malapportionment of the divisions that is alleged in paragraph XII of the complaint. Plaintiffs pray that the District be required to submit a plan for holding all elections at large.

Defendant argues that sections 43730 and 41550 of the California Water Code provide adequate State remedies, that the remedy is not within the Civil Rights Act, and that if it is, this court should abstain due to the adequate State remedies.

■ California Water Code §§ 43730 and 41550 do not provide an adequate State remedy for malapportionment. Section 43730 pertains to improper board action and 41550 provides a means of forcing the board to-hold an election. Section 41152 provided the redivisioning remedy which plaintiffs seek, but was repealed in September 1969. From that date to the present, there has been no adequate State remedy.

Section 39777 will not grant relief as it merely requires initial segregation in divisions "possessing the same general character of water rights or interests in the water of a common source." Nor does section 41153 help, as it merely contemplates that the board may make a redivision order; however, there is no mandatory requirement present.

Where there is no State remedy and a Civil Rights violation occurs, 42 U.S.C. § 1983 has been interpreted "to provide a remedy . . . ." [McNeese v. Board of Education, 373 U.S. 668, 672, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963)].

■ Here we have divisions created by a state engineer (approved) acting under state law, and these divisions have been maintained by the Board of Directors also purporting to act under state law. This action is within 42 U.S.C. § 1983. [See, Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)].

The present divisions have not been redivisioned for 40 years. Total assessed valuation of the land in Division 4 is nearly three times greater than the total assessed valuation of Division 10 (Divi-

sion 4—$1,954,547; Division 10—$688,-425). The result is that $100 of assessed valuation in Division 10 has almost three times the voting power of $100 of assessed valuation in Division 4. In addition, Division 4 has 110 separate landowners, whereas Division 10 has only 4. Each division is entitled to one director on the District's Board of Directors. Consequently, the 110 landowners in Division 4 have only one-third the representation on the Board when compared to Division 10.

 Such malapportionment presents a classic violation of equal protection and therefore defendant is ordered to submit a plan to correct this malapportionment within six months of the date this decision becomes final.

If defendant is unable to redivision the district into divisions which are reasonably equal in assessed valuation and also possess the same general character of water rights or interest in the water of a common source as required by section 39777 of the California Water Code, the plan may provide for elections at large.

BROWNING, Circuit Judge (concurring in part, dissenting in part):

Defendant asks this court to abstain from rendering a decision with respect to California Water Code §§ 41000 [1] and 41001.[2] "But the abstention rule only applies where 'the issue of state law is uncertain' " Wisconsin v. Constantineau, 400 U.S. 433, 438, 91 S.Ct. 507, 511, 27 L.Ed.2d 515 (1971), and here the meaning of the challenged state statutes is clear.

Turning to the merits, it is clear at the outset that the Equal Protection Clause applies not only to the challenged statutes but also to their implementation by the defendant district. "The Equal Protection Clause reaches the exercise of state power however manifested, whether exercised directly or through subdivisions of the State." Avery v. Midland County, 390 U.S. 474, 479, 88 S.Ct. 1114, 1117, 20 L.Ed.2d 45 (1968). Defendant and similar entities "are but the agents or representatives of the state in the particular locality in which they exist. They are organized for the purpose of carrying out the purposes of the legislature in its desire to provide for the general welfare of the state." In re Madera Irrigation District, 92 Cal. 296, 317, 28 P. 272, 276 (1891). See Girth v. Thompson, 11 Cal.App.3d 325, 328, 89 Cal.Rptr. 823 (1970).[3]

To evaluate the constitutionality of the challenged voting rules, the purpose and effect of the rules must be examined in the context of the district's activity. "In determining whether or not a state law violates the Equal Protection Clause, we must consider the facts and circum-

---

1. See majority opinion at note 1.

2. See majority opinion at note 1.

3. California Water Code § 39059 declares that the powers conferred upon the board of directors of a water storage district "are police and regulatory powers and are necessary to the accomplishment of a purpose that is indispensable to the public interest." Section 39061 declares that use of water in a water storage district, and of facilities and property to carry out the district's functions under the statute, "is a public use."

 Water storage districts are governed by California Water Code §§ 39000–48401. The board of each district has "all powers and authority necessary to enable it to fully perform the duties imposed upon it . . .." § 43150, see generally §§ 43000–44000. This includes the power to employ and discharge persons on a regular staff and to contract for the construction of district projects. § 43152.

 The district can initiate projects and supervise their completion. §§ 42200–42750. It can condemn private property for use in such projects. §§ 43530–43533. It may cooperate with and contract with other agencies, state and federal. § 43151.

 The district can authorize general obligations bonds and interest-bearing warrants. See §§ 44900–45900. It can also impose tolls or other charges on the use of its water, irrigation mechanisms, and other services and facilities. It can levy "assessments" up to $2.50 per acre for organizational expenses and costs incurred in undertaking specific projects; for all other purposes, assessments are prorated to the extent of benefit conferred by the district project. See, §§ 46000–47900.

stances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification." Williams v. Rhodes, 393 U.S. 23, 30, 89 S. Ct. 5, 10, 21 L.Ed.2d 24 (1968), quoted in Kramer v. Union Free School District, 395 U.S. 621, 626, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969).

## I

Exclusion of persons from the vote must be "carefully scrutinized," and can be sustained only if "necessary to promote a compelling state interest." Kramer v. Union Free School District, *supra*, 395 U.S. at 627, 89 S.Ct. at 1890.[4] It cannot be sustained unless "those excluded are in fact substantially less interested or affected than those the statute includes." *Id.* at 632, 89 S.Ct. at 1892.[5] Thus the interest of the state in confining the franchise to owners of land in the district must be weighed against the interest of those said to be disadvantaged by this classification, namely, lessees of such property and non-landowning district residents.

It appears that there is compelling reason for disenfranchisement of non-owner, non-lessee residents of the district, but not, contrary to the majority's holding, for the exclusion of lessees of district land.

The relevant facts may be briefly summarized.

Much of California's agricultural land suffers from too little water or, intermittently, from too much. Conservation, distribution, and control of the wa-

ter supply are major state concerns.[6] The California Legislature has authorized a wide variety of special instrumentalities, including water storage districts, to provide a flexible response to water problems on a local basis. These special purpose agencies are credited with "vastly expanding water distribution facilities" in the state. Rogers & Nichols, Water for California, Vol. 2, § 448, at 35.

The defendant water storage district consists of 193,000 acres of intensively cultivated, highly fertile farm land. The district is sparsely populated—only 78 persons, including 18 children, live within its boundaries. This is said to be typical of such districts because the lands are agricultural, and because they are commonly arid, subject to flooding,[7] or both. Nearly 85 per cent of the land in the district is farmed by four corporations. The residents of the district are all employees, or members of employees' families, of one or another of the four farming corporations. Only two residents are landowners; not directly, but through ownership of a corporation that farms about 16 per cent of the district's land.

Landowners have a direct and substantial interest in the efficient and effective management of the district. In keeping with the purpose of water storage districts, defendant district is authorized to plan and execute projects "for the acquisition, appropriation, diversion, storage, conservation, and distribution of water." Calif.Water Code § 42200.[8] Defendant district has adopt-

---

4. *See also* Cipriano v. City of Houma, 395 U.S. 701, 704, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969).

5. *See also* Cipriano v. City of Houma, *supra*, 395 U.S. at 704, 89 S.Ct. 1897, 23 L.Ed.2d 647. Phoenix v. Kolodziejski, 399 U.S. 204, 207, 212–213, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970).

6. *See, e. g.*, California State Constitution, Article XIV, § 3; California Water Code §§ 100, 104, 105. *See* note 2.

7. Nearly half of the land in the defendant district was flooded in 1969. One third of the district still remains under water.

8. The plans may also include "any drainage or reclamation works connected therewith, and the generation of hydroelectric energy incident thereto, and to sale and distribution thereof. . . . ." By the express terms of the statute, however, these additional powers may be used only in connection with and incidental to a plan to acquire, divert, store, conserve, and distribute water in the district. There is no evidence that the defendant district engaged in the generation, sale, or distribution of electric power.

ed and executed three such projects since its formation in 1924. These projects involved the purchase and storage of water for irrigation of lands within the district and the construction of a water delivery system. Each project required a multi-million dollar expenditure. In accordance with the statute (Calif.Water Code § 46176), the costs were assessed upon the lands of the district in proportion to benefits received by each tract.

The economic burden from district projects *cannot* fall on non-owner, non-lessee residents. There are no forms of non-property oriented taxes, assessments, or other means through which district costs could be spread to others. *Cf.* Cipriano v. City of Houma, 395 U.S. 701, 705, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969); Phoenix v. Kolodziejski, 399 U. S. 204, 209–210, 90 S.Ct. 1990, 26 L.Ed. 2d 523 (1970).

The district performs no governmental function and provides no service of direct concern to residents of the district. *Cf.* Phoenix v. Kolodziejski, 399 U.S. at 206, 209, 90 S.Ct. 1990, 26 L.Ed.2d 523. Its activities relate solely to the storage and distribution of water for use in farming the land.[9] These functions and services would not differ at all if no one lived in the district. The district has nothing to do with furnishing police and fire protection, schools, roads, and other governmental services and facilities usually provided to residents of an area. For that reason, people who happen to reside within the physical boundaries of the district are not constituents of the officers or board of directors of the district in any real sense.

As employees of the farming corporations, residents of the district have an interest in the success of the farm operation and, hence, in the activities of the district that contribute to the success of those operations. But this interest is no different in kind or degree from the interest of other employees of the farming corporations who do not reside in the district, and is little different from the interest of non-resident suppliers and others whose economic well-being may be linked to the success of the district's farming operations. If residents are constitutionally entitled to vote in district elections because of their interest as employees, so too are non-resident employees and, perhaps, all other economically affected non-residents.

Against this factual background, it is possible to evaluate the state's interest in limiting the franchise and the impact of the limitation upon disenfranchised lessees and residents.

The state's interest in the management of its water resources, and, therefore, in the creation and effective operation of water storage districts and similar agencies, is obviously a vital one. Limitation of the franchise to those who own or lease district land is necessary to further this compelling state interest for two reasons.

First, the limitation is necessary to induce landowners to join in the creation of such districts. It is inconceivable that the non-resident owners, controlling 85 per cent of the land in the defendant district, would have agreed to formation of the district or its continued existence had they been denied control over the selection and implementation of the multi-million dollar district projects designed solely to benefit the lands of the district and to be paid for entirely by assessment upon those lands. *See* Schindler v. Palo Verde Irrigation District, 1 Cal.App.3d 831, 839, 82 Cal. Rptr. 61 (1969).[10] It is also unlikely

---

9. Plaintiffs argue that defendant district has the power to, and does, engage in flood control activities, and that these are obviously of interest to residents of the district. The power of the district in this respect is disputed, but any such power the district might possess would be limited to flood control connected with and incident to the exercise of the district's primary functions of water storage and distribution.

10. There are, in fact, "unique problems that make it necessary to limit the vote.

that non-resident landowners would have participated had landowner control been subject to unpredictable dilution or deliberate manipulation [11] by the votes of residents having only a remote interest in the district's operations.

In the second place, in view of the nature of the issues to be voted upon, the exclusion of non-owner, non-lessee residents from the franchise in a water storage district is dictated by the state's interest in obtaining intelligent and responsible decisions as to the most effective water development program for the lands of the respective districts.[12]

Turning to those who are assertedly disadvantaged, it is evident from the foregoing discussion that the interest of residents who neither own nor lease property within the district is substantially less significant than that of the owners, and is both remote and indirect. Their exclusion from district elections can have only a minimal impact upon them, and is amply justified by the compelling state interest.

Contrary to the majority's view, however, this is not true of the exclusion of those who lease lands in the district for farming. This group's interest in the district's projects to increase the water available for farming and to improve its distribution is indistinguishable from the interest of the owners. They are also equally interested in the cost of the district's projects, for this expense will be passed on to them by express agreement or in the form of increased rentals. *See, e. g.,* Phoenix v. Kolodziejski, *supra,* 399 U.S. 204, 210–211, 90 S.Ct. 1990, 26 L.Ed.2d 523.[13] And obviously the state's interest in intelligent and responsible decisions regarding the district's water management program is not advanced by excluding those who actually farm the land.

The only substantial question is whether lessees must be excluded to induce landowner participation. Nothing in the record supports an affirmative answer; and the contrary is strongly suggested by the fact that the four corporations that farm 85 per cent of the district's land are major lessees of land as well as the largest landowners.

Thus, excluding non-owner, non-lessee residents advances the state's overall interest in intelligent and effective water resources development by encouraging the formation of water storage districts and by helping assure informed and interested voters in district elections. Further, it reflects the minimal impact of the district's activities upon this group. However, analysis shows, contrary to the majority's conclusion, that no such considerations justify excluding

---

. . . " Phoenix v. Kolodziejski, 399 U.S. 204, 213, 90 S.Ct. 1990, 1996, 26 L.Ed.2d 523 (1970). We are told that some California water storage districts have no residents, or only a nominal number. Unless ownership of an interest in the district's land were a permissible basis for the franchise, such districts could not function at all.

A similar problem faces reclamation districts organized under Division 15 of the California Water Code. Voting in these districts is also limited to property owners. *See* § 50704. There are no residents on seven such reclamation districts totaling 88,654 acres that are located within the boundaries of defendant water district.

11. Sixty-six of the 78 persons now reported to reside in the district are employees of the corporate farms living on the corporation's land.

12. Oregon v. Mitchell, 400 U.S. 112, 242, 91 S.Ct. 260, 27 L.Ed.2d 272 (1971) (opinion of Brennan, White, and Marshall, JJ.); Lassiter v. Northampton Elections Bd., 360 U.S. 45, 51, 79 S.Ct. 985, 3 L.Ed. 2d 1072 (1959).

13. Defendant suggests that the lessees might obtain a provision in the lease for a proxy from the lessor as allowed by § 41002. If a statute otherwise infringes upon the Equal Protection Clause, the infringement of constitutional rights is not ameliorated by a possibility that relief might be obtained through private contracts.

lessees of district land from participating in the voting.

## II

Since ownership of a property interest in district land may be required as a qualification for voting in water storage district elections, it might seem to follow that it would also be permissible to weight the votes in proportion to the value of the voter's land, as the majority holds. *See* Schindler v. Palo Verde Irrigation District, *supra*, 1 Cal.App.3d at 839, 82 Cal.Rptr. 61. Brief consideration demonstrates, however, that this is not so.

In a wide variety of contexts the Supreme Court has emphasized that where an election concerns the exercise of important governmental powers having a substantial impact upon all members of the particular electorate, as here, the state is required to insure that the vote of every member of the electorate counts the same, so far as practicable, as that of every other member of the electorate.[14] In Hadley v. Junior College District, 397 U.S. 50, 58–59, 90 S.Ct. 791, 796–797, 25 L.Ed.2d 45 (1970), Mr. Justice Black summarized the Supreme Court's position in language applicable to this case:

"[A] State may, in certain cases, limit the right to vote to a particular group or class of people. As we said before, '[v]iable local governments may need many innovations, numerous combinations of old and new devices, great flexibility in municipal arrangements to meet changing urban conditions. We see nothing in the Constitution to prevent experimentation.' [Sailors v. Board of Education, 387 U.S. 105, 110–111, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967)] *But once a State has decided to use the process of popular election and 'once the class of voters is chosen and their qualifications specified, we see no constitutional way by which equality of voting power may be evaded.'* Gray v. Sanders, 372 U.S. 367, 381 [83 S.Ct. 801, at 809, 9 L.Ed.2d 821] (1963)." (Emphasis added.)

*Cf. id.* at 56. As Justice White said in Phoenix v. Kolodziejski, *supra*, 399 U.S. at 209, 90 S.Ct. at 1994, 26 L.Ed.2d 523, "Presumptively, when all citizens are affected in important ways by a governmental decision subject to a referendum, *the Constitution does not permit weighted voting* or the exclusion of otherwise qualified citizens from the franchise . . . . Placing such power in property owners alone can be justified only by some overriding interest of the owners that the State is entitled to recognize" (emphasis added).

Defendants have identified no compelling state interest in weighted voting in water storage district elections.

The statute itself weakens the contention that landowners would decline to participate in the formation of a water storage district if each vote weighed equally. A majority of the *number* of landowners is normally required to form such a district (Calif.Water Code §

---

14. Avery v. Midland County, 390 U.S. 474, 485, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968); Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967); Lucas v. Colorado Gen. Assembly, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964); Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964); Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964); Maryland Committee v. Tawes, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964); WMCA, Inc. v. Lomenzo, 377 U.S. 633, 84 S.Ct. 1418, 12 L.Ed.2d 568 (1964); Reynolds v. Sims, 377 U.S. 533, 562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Wesberry v. Sanders, 376 U.S. 1, 7–8 (1964); Gray v. Sanders, 372 U.S. 367, 379–380, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963).

39400)[15] and a majority of the *number* of landowners voting is required to approve a district project. Calif.Water Code § 42550.

Neither can it be said that the state's interest in intelligent and responsible elections is served by weighted voting. There is nothing in the record to support the assumption that a small landowner is less likely than a large one to possess the information and understanding of water development problems that is requisite to intelligent and responsible voting on the affairs of a water storage district. *Cf.* Harper v. Virginia Board of Elections, 383 U.S. 663, 668, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). And the landowner's interest in finding and implementing solutions to those problems is no less acute because his operation is small. Efficient production from his smaller acreage may be of greater economic consequence to him; and the lesser absolute share of the cost of district projects he may [16] be required to bear may impose a greater burden. As Judge Wisdom said in a related context, "In terms of voting responsibility, there is no necessary correlation between the amount of an assessment and the degree of interest a taxpayer may have in a particular bond issue. A ten thousand dollar house to one person may mean more to that person than a hundred thousand dollar house to another." Stewart v. Parish School Board of Parish of St. Charles, 310 F.Supp. 1172, 1179 (E.D.La.1970), aff'd 400 U.S. 884,

91 S.Ct. 136, 27 L.Ed.2d 129 (1970). *See also* Burrey v. Embarcadero Municipal Improvement District, 5 Cal.3d 671, 97 Cal.Rptr. 203, 488 P.2d 395 (1971).

### III

The order of the California Department of Water Resources approving the formation of the defendant district divided the district into eleven divisions for election of directors to the district's board.[17]

Each division elects one director, but the number of landowners in the divisions varies from 110 in division four to four in division ten.[18] While the record does not show the number of lessees in each division, there is no reason to believe that the gross malapportionment among the divisions will be corrected merely by including lessees among those qualified to vote.

Such malapportionment does indeed present a classic violation of equal protection. *See* Reynolds v. Sims, 377 U.S. 533, 562–563 & n. 40, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). As Mr. Justice Black said in *Hadley, supra,* after finding that important governmental functions were involved having sufficient impact throughout the constituency, "when members of an elected body are chosen from separate districts, each district must be established on a basis that will insure, as far as is practicable, that equal numbers of voters can vote for proportionally equal numbers of officials."

---

15. The alternative is "not less than 500 petitioners, each of whom is the holder of title to land therein and which petitioners include the holders of title to not less than 10 percent in value of the land included within the proposed district." § 39400.

16. Project costs are distributed in proportion to the benefit conferred upon the particular tract rather than in proportion to the tract's value or size. California Water Code § 46176.

17. California Water Code § 39777 reads: "*Division of district.* The order on final hearing shall also divide the proposed district into five, seven, nine, or eleven divisions so as to segregate into separate divisions lands possessing the same general character of water rights or interests in the water of a common source. The divisions shall be numbered first, second, third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, or eleventh, according to the number of the division."

18. Even were the weighted voting practices of the district valid, the malapportionment would be substantial. The assessed value of the land in division four is $1,954,547, while that of division ten is $688,425.

397 U.S. at 56, 90 S.Ct. at 795, 25 L.Ed. 2d 45.

It is suggested that the apportionment reflects compliance with the statutory directive that division lines be drawn "so as to segregate into separate divisions lands possessing the same general character of water rights." *See* note 17. It is unnecessary to consider whether this would justify the result, if true. The record is clear that the divisional lines were not drawn on this basis.[19] The record also demonstrates that the statutory directive is irrelevant to the drawing of division lines in the defendant district for all water rights in the district are of the same character.[20]

Finally, defendant seems to imply that the malapportionment of divisions does not involve state action subject to the Equal Protection Clause. But as noted earlier, the present divisions were approved by the California Department of Water Resources as required by the statute (*see* note 17), and "the prohibitions of the Fourteenth Amendment extend to all action of the State denying equal protection of the laws; whatever the agency of the State taking the action . . . ." Cooper v. Aaron, 358 U.S. 1, 17, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5 (1958). *See also* Avery v. Midland County, *supra*, 390 U.S. 474, 479–480 88 S.Ct. 1114, 20 L.Ed.2d 45.

19. A "Report on Feasibility of Proposed Tulare Lake Basin Water Storage District," submitted to the California District Securities Commission as an exhibit to defendant district's Amended Report and Estimate of Cost for Project 1, states at pages 73–74:

 "The proposed divisions follow generally the lines of existing reclamation districts. It is also understood that they are adjusted to give the balance of representation desired by the parties to the agreement . . . . "

20. Plaintiffs' factual statement, which defendant accepted without response, states:

 "The water rights of Tulare Lake Basin Water Storage District, for example, its water right in the Kings River

as stated in the Kings River Schedule, and its water right derived from its contract with the state of California, are for the equal benefit of the lands in the District. That is to say, there are no gradations or priorities within the District as to District water."

The following appears in defendant's Amended Report and Estimate of Cost for Project 1 (see note 19):

"That is to say, all waters—whatever that quantity may be—acquired by or under control of the District, are to be *prorated equally over the acreage* in that District. Or, in other words, all things being equal, every acre of land within the *boundaries of your District* will be equally benefited by your project." (Emphasis in original.)